## Riddle, Appellant, *v.* Mellon et al.

[Marked to be reported.]

*Oil and gas lease—Trespass—Estoppel.*

An oil and gas lease was made for the term of " one year and as long as oil or gas is found in paying quantities." The lessee drilled a well during the year, but failed to develop oil or gas in paying quantities. The lessor brought trespass against the lessee, for entering to prosecute further drilling, several months after the year expired; Held:

Under the testimony, as presented at the trial, that the jury were properly instructed that, if the lessor, after the expiration of the year and

before the alleged trespass, encouraged and allowed the expenditure of money and labor in operations on the lease, on the basis of its continuance, he would be estopped from asserting that it was then at an end.

Argued Nov. 25, 1891.    Appeal, No. 292, Oct. T., 1891, by plaintiff, from judgment of C. P. No. 1, Allegheny Co., Sept. T., No. 652, on verdict for defendant.    Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

Trespass by James W. Riddle against W. L. Mellon and others, to recover damages for an entry made by the defendants upon the plaintiff's farm, for the purpose of drilling for oil.    The defendant's plea was not guilty.

At the trial on May 19, 1891, the following facts were shown :

Being the owner of a farm containing about fifty acres, the plaintiff, on February 21, 1889, made a lease thereof for oil and gas purposes, to Samuel Galey, " for, during and until the full term of one year next ensuing the day and year above written, and as long as gas or oil is found in paying quantities or rental is paid."    The lease contained no other provision upon the subject of the payment of rental than that just quoted.    It provided that operations upon the demised premises should be commenced within thirty days from the date of the lease, and prosecuted with reasonable diligence to completion, or the lease should be null and void, and that all conditions between the parties should extend to their heirs, executors and assigns.

Galey commenced the drilling of a well within thirty days after the date of the lease.    This well was not completed to an oil-producing sand until February 20, 1890.    The defendants alleged that the delay in its completion was due to various hindrances and difficulties encountered in the course of drilling it.    The plaintiff did not concede the truth of this, but he made no objection to the delay in completing the well, and did not seek to take advantage thereof.    The well developed some oil, but after working with it, torpedoing it, and cleaning it out, it failed to produce oil in paying quantities.

Prior to the completion of the well, Galey had assigned the lease to W. L. Mellon.    In the latter part of April, 1890, the plaintiff called on Mellon and requested him to drill the well deeper to a lately discovered sand, known as the fifth sand.

After some conversation, Mellon got out the lease, and sent for a notary public, and the plaintiff acknowledged the lease, so that it might be put on record, and Mellon had it recorded soon afterward. Testimony for the defendants, parts of which are quoted in the opinion of the Supreme Court, infra, tended to show that the acknowledgment of the lease was made in accordance with an understanding and agreement between the plaintiff and Mellon, to the effect that the lease should continue in force, and that Mellon should drill the well deeper, or drill another well on plaintiff's farm, and that subsequently at different times the plaintiff recognized Mellon's rights under the lease as still in force. The plaintiff denied that there was any extension or renewal of the lease, unless the mere acknowledgment of it before the notary public operated, ipso facto in this way.

In May or June, 1890, Mellon had a packer put in the well, but it had no effect in improving its production. In July, 1890, he had a part of the casing pulled, plugged the well in the manner prescribed by law in cases of abandoned wells, and moved the rig over to an adjoining farm for the purpose of making a test there, intending afterwards to return and drill a well upon another part of plaintiff's farm. Testimony for the defendants tended to show that all this was done in accordance with an understanding between Mellon and the plaintiff that this course should be taken. Some of Mellon's machinery, etc., had been left on the farm.

On August 1, 1890, the plaintiff made another lease to A. Learn which contained the following provision: "The lessee is to indemnify lessor against all damages, costs, and expenses whatever, which may be incurred by reason of this lease, owing to a lease heretofore made by said Riddle to Samuel Galey, which lessor claims has expired by its terms." Some time later in the same month, the defendants, against plaintiff's protest, placed on the premises lumber and materials for the erection of a rig with which to drill a new well. This suit was then brought. About August 29th, Learn, the second lessee, hauled a load of lumber on the premises, and the defendants at once hauled it off again. The defendants kept possession of the premises and erected a rig, which they subsequently moved to the old well. In November, 1890, they commenced to drill that well deeper, and in March, 1891, developed oil in paying quantities therein.

The testimony being closed, the court STOWE, P. J., charged the jury in part as follows :

We are met by one or two questions of law, on the face of this lease.   The first is, how long did this lease, by its terms, without reference to other matters except the finding of oil or gas, continue?   We instruct you, although it seems to be a pretty hard construction, or might be under some circumstances,—yet the parties have made the contract for themselves,—that the lease extended but one year, unless within that year oil or gas was found in paying quantities.   So that when the year expired, if gas or oil had not been found by that time, although the operations might be in progress, although it might have been found a few days afterwards by means of the boring of this well, yet the right of the defendants to that oil or gas was gone, because it was not found within the time fixed in the contract.

If I held otherwise—and these are rather matters influencing my own mind than of very much importance to the jury— it would simply amount to this : that because a property was in such a shape that after a while oil or gas might be produced, the lessee, after the termination of the year of the lease, by exercising due and reasonable diligence could hold the property until he might get oil or gas, and keep on at that as long as he chose to operate in a diligent manner, until he went to any ordinary or extraordinary depth.   In that event, I do not know what would become of the rights of the lessor.   He has not said, " You shall have it for a year and as long thereafter as you diligently prosecute your attempt to get oil," but, " within a year."   That conclusion is strengthened by the fact that two or three months seems to be ample time for boring a well; and they have fixed the limit.   If they had wanted a longer time they could have so arranged.   I can see no other way, in accordance with legal principles, than to hold that after one year had expired, assuming, as the evidence indicates, that oil or gas had not been found by that time in paying quantities, Riddle had a right to forfeit this lease if he saw fit.

Assuming it to be true that Riddle at that time had a right to forfeit this lease, the next question is : Did he waive his right ?   If he saw fit to forfeit the lease, then, we instruct you the law is that he could immediately turn these defendants out

of possession or order them off, or he could make a good lease to somebody else. [But, notwithstanding the fact that the rights of the lessee terminated at the expiration of the year, if Riddle acknowledged their right, or encouraged or allowed them to go on by his conduct, intimating to them that he would still maintain the lease and allow them to continue boring for oil until they got it, then he would be estopped from claiming the right to forfeit the lease.] [3] It would be unjust, when the legal right to turn them off was in his hands, for him to apparently, or impliedly, or directly recognize their right to go on, to allow them to expend money and labor on the well, and then after they had got oil, a week, or a month, or a year afterwards, to claim the benefit of the forfeiture. That kind of principle the law will not recognize. There are times when men must speak or forever after hold their peace. They cannot, where they have legal rights, stand by and encourage others in the expenditure of money or labor and then repudiate the direct result of their own encouragement.

[Then, assuming, as I do, that this lease terminated at the end of the first year, the first matter for your consideration is whether or not Riddle did that which encouraged, expressly or impliedly, the defendants to continue their operations in search of oil. If he did, it is now too late, and was too late at any time after that, to undertake to forfeit the lease by reason of the expiration of the time fixed.] [4]

That, however, is not the whole case. If he did not do that, of course, he is entitled to a verdict for nominal damages, which would be six cents, and that is all, as there is no special damage shown. But if he did waive his right, and upon that part of the case you have the testimony as to his conduct in Mellon's office, among other things the acknowledgment and recognition of his signature to this lease, and other matters. I may say, upon that point, that the mere fact that he acknowledged this to be his lease, having been executed by him, would of itself have no weight at all. From that alone, the jury would not be justified in finding that he agreed to an extension of the lease. A notary came to him and he simply said, "That is my signature, I acknowledge that to be my act and deed." Under other circumstances that may be a very pregnant fact and have a great deal of weight, but standing alone

it certainly would not operate in any way as a renewal of the lease, or any recognition, apart from other testimony, of the right of the lessee to go on operating after the expiration of the year. But there is testimony tending to show, or it is claimed, at least, that Riddle assented to their going on, and recognized their right to go on, and that testimony, taken in connection with the fact that he did acknowledge the lease, may be considered by the jury.

If the jury are not satisfied that there was a recognition of the lease, or a waiver by which he was estopped, they might stop there and give a verdict for the plaintiff, because his case is made out. But if there was a waiver, if there were such acts done by him as you think would fairly encourage the lessee to continue operations there, then you come to another question : Whether the lessee or parties, or their contractors (because they are bound by the negligence or difficulties or delay of the contractors), proceeded with reasonable diligence to operate or continue their operations for the discovery and production of oil ? If they did not, even if up to that time the plaintiff had waived his right to take advantage of the forfeiture arising from the expiration of the year, he then had a right, without he did some other act during or after that time to encourage them still further to go on, to repudiate their right to remain in possession, to take possession of the property himself, or to make a new lease.

There is another matter that incidentally arose. It is said that the lessees not only did not prosecute this work with proper or reasonable diligence, but that they actually abandoned it. If they did actually abandon it, did that which from its natural consequences would induce the lessor to believe that they had gone from there and did not intend to come back, he then had a right to take possession of the property and hold it, or lease it ; and in that case would have a right to your verdict.

Now, these points, gentlemen, cover the case as it suggests itself to me. . . .

The plaintiff requests the court to charge :

1. That, by its terms, no oil or gas having been found in paying quantities before February 21, 1890, the lease of J. W. Riddle to Samuel Galey expired or ended at that date.

Answer : Affirmed.

2. That, if the jury find that no work was done prosecuting operations for oil or gas, under the Galey lease, from April or May until August, 1890, that lease would be null and void for want of such operations, even if its term had not expired at the end of the year.

Answer : Affirmed, unless the evidence shows some reasonable excuse for the delay. I cannot say, as a matter of absolute law, that a delay for that length of time would be such as would work an absolute forfeiture of the lease. There might be some cause excusing it. . . .

3. That the lease by J. W. Riddle to A. Learn, in evidence, was an unequivocal act by Riddle, lessor, then in possession of the premises, declaring his intention to avail himself of his right to forfeit the Galey lease.

Answer : Affirmed. When he made the lease to Learn, his right was unquestionably manifested. It was an express claim on his part of the right to retain the property and use it as his own, and therefore would be an unequivocal act of ownership. After that, whatever might be the rights of Learn under the lease, he could not interfere with him one way or the other, even if he had said to the original lessees, " Go on and work." He could not have waived it then, because his right was gone, and every act of his that tended to show a waiver of this lease, must have been, if it was to have any effect, previous to the making of the lease to Learn.

4. There is no evidence of any valid extension of the term of the Galey lease by Riddle.

Answer : Refused. [1]

5. That, under all the evidence, the verdict must be for the plaintiff.

Answer : Refused. [2]

Verdict and judgment for defendants.   Plaintiff appealed.

*Errors assigned*, were (1, 2) the refusal of plaintiff's points ; (3, 4) the parts of the charge embraced in brackets ; (5) that the court did not instruct the jury what specific acts or declarations would estop the plaintiff from treating the lease to Galey as expired.

*James Bredin*, for the appellant. — A lease of land for one year and so long as gas or oil is found in paying quantities, is

" an uncertain interest" within the statute of frauds. To extend the lease after the expiration of the year, without oil or gas having been found in paying quantities, would certainly require a writing signed by the lessor, or such acts on his part, encouraging the lessee to expend money and continue operations, as would, if such operations should prove successful, estop the lessor from alleging that there was a hiatus between the expiration of the fixed term and the finding of the oil or gas.

The court below failed to distinguish between a lease to expire by its limitation at a certain time, if oil or gas is not found sooner, and a lease for a longer term, containing a clause of forfeiture, by enforcing which, if he chooses to do so, the lessor may shorten the term. The plaintiff has always conceded that if the work of torpedoing and cleaning out this well, done with his tacit consent soon after the year expired, had resulted in obtaining oil in paying quantities, he would have been estopped from insisting that the term expired on February 21, 1890, and the lessee would have had the same rights as if such oil had been produced within the year.

But, when the defendants, after this work had proved futile, abandoned, dismantled and plugged the well, and removed the derrick and fixtures to another farm, an entirely different question is presented. Their lease, after February 21, 1890, was to be good only while oil or gas was found in paying quantities. On the meaning of this provision, see Eaton v. Gas Co., 122 N. Y. 422; and on the general principles applied to the interpretation of such leases, see Brown v. Vandergrift, 80 Pa. 142; Munroe v. Armstrong, 96 Pa. 307; Kennedy v. Crawford, 138 Pa. 561. And estoppel is an equitable defence, to be passed upon by the judge sitting as a chancellor: Lewis v. Carstairs, 5 W. & S. 205; Keating v. Orne, 77 Pa. 89; but the court virtually left the whole matter to the jury.

*J. McF. Carpenter*, for the appellees.—Counsel cited: Willis v. N. Gas Co., 130 Pa. 222; Westmoreland N. Gas Co. v. DeWitt, 130 Pa. 235; Putnam v. Tyler, 117 Pa. 570; Woodward v. Tudor, 81* Pa. 382; Bainbridge on Mines, 30.

OPINION BY MR. JUSTICE GREEN, January 4, 1892.

By the terms of the lease from Riddle to Galey it was to

cease at the end of one year, but was to continue as long as gas or oil was found in paying quantities, or rental was paid according to the conditions expressed in the lease.  It was the undoubted fact that neither oil nor gas was found in paying quantities at the end of the year, but some oil was found.  It was also an undisputed fact that, after the expiration of the year, efforts were made, with the knowledge and active assist-ance of the plaintiff, to obtain a larger yield of oil from the well.  On April 28, 1890, some time after the year had ex-pired, the plaintiff, without any objection, and at the mere re-quest of the defendant Mellon, acknowledged the execution of the lease before a notary and it was placed on record on May 13, 1890.  The witness McDonald testified that he was at Mel-lon's office one day in 1890, when Riddle came in, and said to Mellon he had heard he intended to pull the casing out of the well and abandon it, and wanted to know what his intentions were; that Mellon immediately told him he did intend to pull the casing out, and either drill that well deeper or on the ad-joining property; that he intended to develop the farm, and that pulling the casing was not considered an abandonment; and " Mr. Riddle said he was perfectly satisfied with that, pro-vided he could get some hauling. . . . . He said he would acknowledge the lease, which he afterwards did, and he went out in high glee, and seemed perfectly satisfied that Mr. Mel-lon owned the lease, and was going ahead to develop the terri-tory."  The consideration of such testimony was, of course, for the jury; and, if believed, it clearly authorized an inference that Riddle consented to a continuance of the relation between himself and Mellon in the prosecution of further work under the lease.

Mellon testified on the same subject.  He said that Riddle came to his office about the twenty-third of April, 1890, and asked him whether he was going to do any more work on the farm: "I told him that I was; that I had leased a number of other farms adjoining, and intended to do some drilling on them, and also drill another well on him.  .He said to me that if I took the rig down, that it would be an abandonment.  Well, I told him I would go on, and drill another well on his farm.  ' Well,' he says, ' that is all right.'  So I took the old rig down, and moved it over on the Scott farm, the adjoining

farm, and proceeded to build a new rig on his farm ; but before I had the new rig on his farm, he had leased to another party. I'm a little ahead of my story. The day he came into my office—Q. That date seems to be the twenty-eighth of April? A. I thought it was the twenty-third. Whatever day it was, when he came in I told him I would drill another well on his farm. 'Well, that is all right,' he says. I asked him to acknowledge the lease then, and we would put it on record. He did so, and I took it up shortly afterwards, and put it on record here in court. . . . . Q. Now, after the lease was acknowleged, did you go on and spend money on his place ? A. Why, yes ; I immediately commenced to develop the land I had taken up. Q. Did you go on his place ? A. I went on the place. The engine had been drilling there a year, and the boiler was in poor repair. I had to get things repaired, and the rig running to drill another well." After testifying that Riddle had promised to take care of the first well for him, and to do whatever was necessary to be done about a well, and that he continued to do so from the time the first well was finished till the new one was commenced, he was asked: " Q. Now, you stated when you made this arrangement in April, 1890, that you promised him that you would develop the adjoining territory, and also go on on his farm after a while ; did you afterwards go on ? A. Oh, yes ; I commenced it, and put the rig up on his farm, two weeks after I had the rig up on the adjoining farm. Q. Have you drilled another well there ? A. I have drilled a second well, and started a third. Q. On this Riddle farm ? A. On the Riddle farm. Yes, sir." On cross-examination, he was asked : " Q. Didn't you, in June, 1890, abandon that particular well ? A. No, sir, I had a clear understanding with Mr. Riddle. Q. Didn't you pull down the rig ? A. I pulled it down, but I talked with him about it beforehand. Q. Didn't you pull the casing ? A. Yes, sir, I used it on the other farm, on the adjoining farm. Q. Didn't you plug the hole ? A. I plugged the hole, according to law, because I expected to drill. . . . Q. Now, then, did you ever commence to drill on that land till November, 1890 ? I am not speaking of hauling stuff there, or anything of that sort, but was there a stroke of work done at drilling a well until November, 1890 ? A. It was along about that time, yes, sir. All

I was to do was to drill a well.   Mr. Riddle and I had talked the thing over, and I was to drill this one well, or drill another one.   He said, if I gave him the hauling for his well, and so on, it was all right if I would drill him a well, and I promised to do that, and fulfilled it."

If this testimony was believed by the jury we do not see how they could resist the conclusion that Riddle consented to another well being put down by Mellon, after knowing precisely what had been done at the first well, after the subject of an abandonment by taking down the rigging of the first one had been discussed between them, and that Riddle agreed that Mellon might do exactly what he said he would do, and testified that he had done.   There is much more testimony corroborative of Mellon's, but it is unnecessary to repeat it.   The whole effect of it was for the jury.   The learned judge of the court below, in a charge which was exceedingly fair for the plaintiff, committed the whole subject to the jury, and gave the plaintiff every possible chance to recover, if he could, under the testimony; but the jury found the facts against him, and, as it seems to us, with entire propriety.   It was not possible for the court to take the facts away from the jury, and pronounce upon them as matter of law.   We think the instructions of the court complained of in the assignments of error were altogether correct, and that the verdict was just and right, upon a fair view of the whole testimony.

Judgment affirmed.                                C.